IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-313-D

| | |
|---|---|
| THE TRANSENTERIX INVESTOR GROUP, Individually and on behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TRANSENTERIX, INC., TODD M. POPE, JOSEPH P. SLATTERY, PAUL LAVIOLETTE, ANDREA BIFFI, DENNIS J. DOUGHERTY, JANE H. HSIAO, WILLIAM N. KELLEY, AFTAB R. KHERANI, DAVID MILNE, RICHARD C. PFENNIGER, JR., WILLIAM STARLING, and CANTOR FITZGERALD & CO.<br><br>Defendants. | AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>15 U.S.C. §§78j(b), 78t(a), 78t-1<br>17 C.F.R. §240.10b-5<br>15 U.S.C. §§77k, 77o<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

The TransEnterix Investor Group, consisting of Lead Plaintiffs Randall Clark, Samir Patel, the Underhill Cemetery Association, and the North Underhill Cemetery Association ("Plaintiffs"), by and through their undersigned attorneys, individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included a review of Defendants' public documents, conference calls, announcements, and United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding TransEnterix, Inc. ("TransEnterix" or the "Company"); analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons who purchased or otherwise acquired TransEnterix stock between February 10, 2016 and May 10, 2016, inclusive (the "Class Period"), against TransEnterix and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act"). As set forth in detail below, Defendants violated Sections 10(b), 20(a), and 20A of the 1934 Act by engaging in a manipulative scheme intended to benefit themselves at the expense of ordinary investors who purchased TransEnterix stock during the Class Period.

2. Plaintiffs also bring claims on behalf of themselves and a subclass of investors who purchased or otherwise acquired TransEnterix common stock in connection with the Company's "at-the-market" offering between February 9, 2016 and April 19, 2016 (inclusive) (the "Securities Act Class Period") against TransEnterix and certain of its officers and/or directors and underwriters for violations of the Securities Act of 1933 (the "Securities Act"). As set forth in detail below, the Securities Act Defendants (defined below) violated Sections 11 and 15 of the Securities Act by engaging in negligent conduct that resulted in damages to investors. Plaintiffs' claims under the Securities Act do not sound in fraud.

3. TransEnterix is a medical device company that seeks to use flexible instruments and robotics to improve the outcomes of minimally invasive surgery. Of relevance here is the Company's focus on the development and commercialization of the SurgiBot System ("SurgiBot"), a single-port, robotically enhanced laparoscopic surgical platform. The surgical approach and motions used with the SurgiBot robotic device are intended to mimic established laparoscopic surgical techniques, namely for bariatric and gynecologic surgery. The system utilizes flexible instruments through articulating channels controlled directly by the surgeon, with robotic assistance, from within the sterile field. The flexible nature of the system is intended to allow multiple instruments to be introduced and deployed through a single incision. At a projected cost of $500,000, the SurgiBot was designed to be a lower-cost alternative for the surgical robot

industry, which is dominated by a surgical device called the da Vinci System, which costs approximately $2 million.

4. Prior to the start of the Class Period, on June 1, 2015, the Company issued a press release announcing that it had submitted its 510(k) application to the United States Food and Drug Administration ("FDA") for the SurgiBot.

5. According to the FDA, Section 510(k) of the Food, Drug, and Cosmetic Act requires device manufacturers to notify the FDA of their intent to market a medical device at least 90 days in advance. This is known as Premarket Notification – commonly referred to within the industry as a "510(k)." This 90-day notification allows the FDA to determine whether the device is "substantially equivalent" to a device already placed into one of three classification categories, *i.e.*, whether the device is as safe and effective as similar, legally marketed products. Put simply, manufacturers use a 510(k) to demonstrate their devices are "substantially equivalent" to existing devices.

6. Specifically, medical device manufacturers are required to submit a 510(k) if they intend to introduce a device into commercial distribution for the first time or reintroduce a device that will be significantly changed or modified to the extent that its safety or effectiveness could be affected. Until the FDA issues an order declaring a device to be substantially equivalent, a manufacturer may not proceed to market the device.

7. Describing the Company's 510(k), TransEnterix's June 1, 2015 press release stated, in relevant part:

> "TransEnterix is pleased to deliver on our commitment to file for 510(k) clearance for the SurgiBot System by mid-2015," said TransEnterix President and CEO, Todd M. Pope. "Robotically enhanced laparoscopy with the SurgiBot System represents the first surgical platform designed to address economic and clinical challenges associated with current laparoscopic and robotic options. We view the SurgiBot as a market-expanding technology with a compelling value for a wide variety of surgical facilities with the potential to deliver critical benefits to surgeons, hospitals and patients. We look forward to continuing our preparation to bring this innovative technology to the market upon FDA clearance."

8. During the Class Period, Defendants made numerous positive statements about the SurgiBot. For example, on February 10, 2016, the Company issued a press release announcing that it had finalized its FDA submission related to the SurgiBot 510(k) application, with Company President and Chief Executive Officer ("CEO") Todd M. Pope ("Pope") commenting:

> We are pleased to have completed our response to the FDA and strengthened our balance sheet. ***We continue to expect FDA clearance for the SurgiBot System in the first quarter of this year, and our cash position allows us to accelerate our transition to commercializing both the ALF-X and the SurgiBot***.

9. After the market closed on April 20, 2016, Defendants shocked investors when the Company revealed that the FDA notified TransEnterix on April 19, 2016 that the FDA had determined the SurgiBot "does not meet the criteria for substantial equivalence based upon the data and information submitted by TransEnterix in its 510(k) submission."

10. Then, after the market closed on May 10, 2016, the Company further shocked the market when it announced that it was "reprioritiz[ing] its near-term regulatory efforts" and shelving the SurgiBot. Instead of pursuing approval and commercialization for the SurgiBot, which would require a new 510(k) submission, Defendants revealed the Company would now "focus [its] resources on the commercialization of and regulatory clearance for the ALF-X System." TransEnterix further stated that it would "delay any potential re-filing for the SurgiBot System" until after the Company could achieve 510(k) clearance for its other robotic surgical device, the ALF-X System (the "ALF-X"), despite the fact that it did not expect to submit a 510(k) for the ALF-X until the fourth quarter of 2016. Defendants also revealed that TransEnterix had "taken actions to reduce headcount and investment related to the SurgiBot."

11. During a conference call after the market closed on May 10, 2016, Defendant Joseph P. Slattery ("Slattery") stated that TransEnterix was "reduc[ing] head count investment in SurgiBot production and development" which "resulted in an annualized reduction in salaries of approximately $4 million." The next day, the Triangle Business Journal reported that TransEnterix "cut ties with an estimated 50 employees in the United States – about 40 percent of its workforce in this country."

12. In response to the Company-specific, negative news revealed in the Company's April 20, 2016 press release, the price of TransEnterix stock declined substantially. After closing at $4.74 on April 20, 2016, the stock opened at $1.57 per share on April 21, 2016, falling to a low of $1.28 and ultimately closing at $2.27, a decline of more than 50%, on abnormally high trading volume of more than 21.5 million shares. Then, in response to the negative news revealed after the market closed on May 10, 2016, the price of TransEnterix stock dropped again, falling more than 10% to close at $1.84 on May 11, 2016, on elevated trading volume of more than 5.5 million shares.

**JURISDICTION AND VENUE**

13. The claims asserted herein arise under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, and Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k(a) and 77o(a). Jurisdiction is conferred by Section 27 of the 1934 Act, 15 U.S.C. §78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

14. Venue is proper in this District pursuant to Section 27 of the 1934 Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b) because the Company's headquarters are located in this District and certain of the acts alleged in this Amended Complaint occurred in this District. The violations of law complained of herein occurred in part in this District, including the dissemination of materially false and misleading statements complained of herein into this District. TransEnterix's headquarters are located in this District at 635 Davis Drive, Suite 300, Morrisville, North Carolina 27560.

15. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. TransEnterix trades in an efficient market on the New York Stock Exchange MKT ("NYSEMKT").

## PARTIES

16. Plaintiffs Randall Clark, Samir Patel, the Underhill Cemetery Association, and the North Underhill Cemetery Association purchased TransEnterix stock as described in their Certifications submitted in support of their motion for appointment as lead plaintiff. Plaintiffs suffered damages in connection with their purchases of TransEnterix stock. Plainitffs' Certification are incorporated herein by reference.

17. Defendant TransEnterix, Inc. is incorporated in Delaware and has its headquarters in this District. Shares of TransEnterix stock trade on the NYSEMKT under the ticker symbol "TRXC."

18. Defendant Todd M. Pope is and at all relevant times was President and CEO of TransEnterix.

19. Defendant Joseph P. Slattery is and at all relevant times was Executive Vice President and Chief Financial Officer of TransEnterix.

20. TransEnterix, Pope, and Slattery are referred to herein as "Defendants".

21. Defendants Pope and Slattery (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of TransEnterix's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

22. Cantor Fitzgerald & Co. ("Cantor Fitzgerald") served as TransEnterix's sales agent and underwriter in connection with the Company's "at-the-market" offering which occurred between February and April 2016.

23. Paul LaViolette, Andrea Biffi, Dennis J. Dougherty, Jane H. Hsiao, William N. Kelley, Aftab R. Kherani, David Milne, Richard C. Pfenniger, Jr., and William Starling were directors of TransEnterix at all relevant times herein (the "Director Defendants").

24. TransEntereix, Pope, Slattery, the Director Defendants, and Cantor Fitzgerald are referred to herein as the "Securities Act Defendants".

25. Pope, Slattery, and the Director Defendants are referred to herein as the "Individual Securities Act Defendants".

## I. 1934 ACT ALLEGATIONS

### A. FRAUDULENT SCHEME AND COURSE OF CONDUCT

26. Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about TransEnterix. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TransEnterix stock was a success, as it: (a) deceived the investing public regarding TransEnterix's prospects and business; (b) artificially inflated the price of TransEnterix common stock; and (c) caused Plaintiff and other members of the Class, as defined below, to purchase TransEnterix stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

27. Defendants' false statements and/or material omissions related to the SurgiBot product and the Company's plans for commercializing it. Throughout the Class Period, Defendants represented to investors that they expected the FDA to approve the Company's 510(k) application for the SurgiBot and that the commercialization of the SurgiBot would be one of the Company's main focuses in terms of generating revenue. In response to these statements, TransEnterix's stock price increased and, in turn, TransEnterix was able to generate critical investment revenue through public stock offerings.

28. Defendants' statements, however, were materially at odds with existing facts known by Defendants at the time they made the statements. In sum, these facts show that Defendants knew that the 510(k) application was insufficient in terms of achieving "substantial equivalence" (*i.e.*, being approved by the FDA), as explained below:

(a) Increased Scrutiny on Robotic Devices. During the summer of 2015, the FDA hosted a public forum in Silver Spring, Maryland, on July 27-28, 2015. The name of the forum was "Robotically-Assisted Surgical Devices: Challenges and Opportunities."

(b) The forum included at-length discussions about the risk of adverse incidents in robotically-assisted surgical devices and the need for more substantive regulation and approval measures. Dr. William Maisel, Director of the FDA's Office of Device Evaluation, stressed the need for maintaining rigorous evidentiary expectations in the course of approval. Dr. Maisel made his comments in spite of recognizing the benefits of reducing the time it takes to bring good products to market.

(c) Mr. Joshua Nipper, Deputy Director of the FDA's Division of Surgical Devices in the Office of Device Evaluation, followed Dr. Maisel by detailing the comprehensive process comprising the 510(k) application.

(d) Dr. Russell Taylor, Director of Johns Hopkins University's Engineering Research Center for Computer-Integrated Surgical Systems and Technologies, spoke at length about the potential dangers and pitfalls of robotically-assisted surgical devices, identifying numerous areas of concern such as termination, repeatability, failure recovery, and human factors. Human factors, according to Dr. Taylor, was "absolutely crucial." As alleged below, the FDA agreed with Dr. Taylor, as evidenced by a series a guidance documents the FDA published several months after the public forum.

(e) Additional speakers echoed the concerns over robotically-assisted devices. During one panel discussion regarding preclinical testing, Dr. Binita Ashar, Director of the FDA's Division of Surgical Devices highlighted the need for clinical testing (over and above animal and cadaver testing) for certain components of the robotically-assisted surgical devices, such as failure

recovery, redundancy, and interoperability. Dr. Taylor seconded Dr. Ashar's concerns, suggesting that manufacturers provide more reporting on the way robotically-assisted surgical devices perform in practice.

(f) In general, the FDA and other speakers voiced concern over hasty approval of certain robotically-assisted devices.

(g) Financial analysts also perceived the FDA's public forum as a sign of increased scrutiny over robotically-assisted devices, especially for devices with specific indications (such as the SurgiBot, which TransEnterix billed as being intended for laparoscopic applications including bariatric and gynecologic surgery). Sterne Agee, in particular, stated that approval robotically-assisted devices indicated for "specific surgical procedures" were less likely to be approved than those intended for "general surgery."

(h) In addition to the public forum, the FDA also released several guidance documents during the same time period impacting robotically-assisted devices. These guidance documents, which the FDA issued in or around February 2016, discussed human factors and usability considerations at length. The FDA's focus on human factors indicated that the FDA was concerned about the potential impact that poor human factors engineering and usability engineering practices could have on the safety and effectiveness of medical devices as well as the public health risks associated with user error. The FDA intended its guidance to be incorporated by manufacturers in premarket submissions, such as providing the FDA with human factors data in support of 510(k) applications. These guidance documents explicitly identified robotic surgery devices as being among the devices that the FDA expected to be supported with human factors data in premarket submissions. Moreover, these guidance documents advised manufacturers that premarket submissions for devices identified as needing human factors data should either provide the data and testing identified within the guidance documents or provide a detailed explanation as to why such data is not necessary. The messages conveyed by these guidance documents echoed the concerns articulated by Dr. Taylor and others during the FDA's public forum in July 2015.

(i) Defendants (and, in particular, Pope) were aware of the FDA's increased scrutiny over robotically-assisted devices and, importantly, how this scrutiny negatively impacted TransEnterix's pending 510(k) application for the SurgiBot. Proof of Pope's awareness of the FDA's new requirements is evident from his comments during the May 10, 2016 investor conference call. During the call, Pope admitted that he was aware that the "landscape [had] changed" for robotic devices during the 510(k) application. Pope explained that he had become aware of the changing "landscape" as a result of the FDA's "public forum" as well as "three or four guidance documents" released during the application process. Upon information and belief, the "public forum" and "guidance documents" referenced by Pope during the May 10, 2016 investor conference call was in fact the FDA's public forum and guidance documents discussed above, as these items were of significant importance within the robotically-assisted surgery device community.

(j) <u>Defendants Communicated Frequently with the FDA</u>. Defendants received individual communications from the FDA in addition to the communications they received publically via the FDA's public forum and guidance documents.

(k) On numerous occasions, Pope reported to investors that he and others at TransEnterix had been having frequent and open communications with the FDA about the pending 510(k) application for the SurgiBot. TransEnterix held a pre-submission meeting with the FDA in 2013, filed a pre-submission notice in March 2014, received written feedback on the pre-submission in June 2014, submitted the 510(k) application in June 2015, received a request for additional information in August 2015, and completed its 510(k) application in February 2016.

(l) Among other things, the FDA's request for additional information focused on human factors testing and evaluation. TransEnterix attempted to satisfy the FDA's requests concerning human factors issues, including regulatory requirements for human factors engineering such as HE75, IEC 62366 as well as the FDA's guidance documents on applying human factors and usability engineering to medical devices.

(m) Throughout this time, TransEnterix and the FDA communicated openly and frequently—as described by Pope, TransEnterix had an "extensive history of interactions with the [FDA]" consisting of "numerous interactions with the FDA in planning and completing the SurgiBot 510(k) submission." Upon information and belief, the FDA's private communications with Defendants during the 510(k) application process comported with its public statements about the need for increased scrutiny over robotically-assisted devices and, in particular, human factors testing and data.

(n) Defendants completed the 510(k) application and, therefore, knew the contents of the 510(k) application. Pursuant to Subpart E of 21 C.F.R. 807, the official correspondent of the firm must certify and sign the 510(k) statement submitted in conjunction with the 510(k) application. TransEnterix certified its 510(k) application and, therefore, knew the contents of the 510(k) application.

(o) Defendants, having spoken regularly with the FDA throughout the 510(k) application process, knew that the SurgiBot's 510(k) application was insufficient for "substantial equivalence" findings, *i.e.*, the application did not meet the requirements for approval.

(p) <u>Defendants Changed the Focus of TransEnterix's Operations</u>. Defendants changed the trajectory of TransEnterix once it became clear that the FDA would reject the SurgiBot's 510(k) application.

(q) This change of course became evident in several ways, most significantly the purchase of and reallocation of resources on the ALF-X. TransEnterix purchased the ALF-X from Italian-company SOFAR S.p.A. in September 2015, late in the third quarter of TransEnterix's fiscal 2015 year. The ALF-X and over 20 instruments had already received regulatory clearance in Europe and had received a "CE Mark" signifying the clearance of the device in Europe for marketing purposes and use in general surgery, urology, gynecology, and thoracic surgery. Furthermore, the ALF-X had already been demonstrated in a number of European hospitals and had a track record of clinical data and experience.

(r) Over the following two fiscal quarters, TransEnterix devoted more and more resources to the ALF-X over the SurgiBot. For the fourth quarter of fiscal 2015, TransEnterix's operating expenses were "primarily associated with the commercialization of the ALF-X" as well as the development of the SurgiBot. TransEnterix's operating expenses during the first quarter of fiscal 2016, which increased year-over-year by almost $10 million, were largely due to "a result of increased investment in the development and commercialization of the ALF-X and other costs related to the ALF-X platform."

(s) Furthermore, at or around the same time, TransEnterix increased recruitment in Europe marketing and commercialization efforts while downsizing United States operations relating to the SurgiBot. Defendants also recruited first-rate talent to focus full-time on the ALF-X, including hires who formerly worked for Intuitive Surgical, Johnson & Johnson, Medtech Covidien, Stryker, and Medtronic.

(t) The fact that Defendants opted to minimize investment in the SurgiBot by reallocating the Company's resources to ALF-X confirms that Defendants were aware that the FDA had signaled that the 510(k) application would be rejected and that commercialization of the ALF-X was far and away the better objective.

29. In light of the above facts, Defendants knew that the public documents and statements issued or disseminated in the name of the Company about the SurgiBot were materially false and misleading, knew that such statements or documents about the SurgiBot would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents about the SurgiBot as primary violations of the federal securities laws. As such, Defendants acted with scienter.

30. Defendants' scienter is further evidenced by the fact that they profited significantly as a result of their fraudulent scheme and course or conduct. Specifically, TransEnterix was able to obtain critical investment revenue through public offerings of its stock at artificially inflated prices. As of December 31, 2015 (shortly before the beginning of the Class Period), TransEnterix had $38.4 million of cash which, according to Defendants, would have been insufficient to fund

operations through the end of 2016. By Defendants' own estimates, TransEnterix would not be able to submit a 510(k) application for ALF-X until late-2016. Further, Defendants did not expect the ALF-X to be on the market until 2017. Accordingly, the Company's cash as of the start of the Class Period would not last long enough for Defendants to bring the ALF-X to market in the United States and begin to generate revenue. Without revenue from the SurgiBot or the ALF-X, TransEnterix would not be able to remain a going concern.

31. To overcome this revenue shortfall, Defendants commenced an "at-the-market" offering in March 2016 whereby TransEnterix received gross proceeds of over $14 million from the sale of approximately 3.4 million shares of TransEnterix stock at an average market price of $4.11 per share. The "at-the-market" offering continued through to April 18, 2016, whereby TransEnterix received additional gross proceeds of $27.1 million from the sale of approximately 5.3 million shares at an average market price of $5.07 per share. By completing the offering when they did, Defendants were able to take advantage of the artificially inflated market that they created through their false and materially misleading statements and raise enough cash to extend operations through the third quarter of fiscal 2017.

32. This influx of investment revenue was critical to Defendants. Prior to fiscal 2016, TransEnterix incurred operating expenses of about $10 million per quarter. Accordingly, without raising capital through the "at-the-market" offering, TransEnterix would have depleted its cash before it could even submit a 510(k) application for the ALF-X, let alone bring it to market and begin generating revenue.

33. The timing of the "at-the-market" offering also strongly implicates Defendants as having acted with scienter. As alleged below, the truth concerning the SurgiBot and Defendants' intentions with regard to its commercialization emerged on April 20 and May 10, 2016. In direct response to this news, TransEnterix's stock price dropped precipitously from a Class Period high of over $5.50 per share to $1.84 per share. Had Defendants waited until May 10, 2016 to conduct the "at-the-market" offering, they would have only generated approximately $16 million (8.7 million shares at an average per-share price of $1.84) in gross proceeds. This revenue (combined

with the revenue TransEnterix had on hand as of December 31, 2015) may have at best allowed the Company to continue through to 2016 and, in all likelihood, not long enough to allow TransEnterix to generate revenue from sales of the ALF-X. Indeed, TransEnterix warned investors in its annual report for fiscal 2015 that it was at risk of not having sufficient funds to continue operations for another year.

34. The timing and amount of Defendants' "at-the-market" offering was of critical importance to TransEnterix, far more than any ordinary company's interest in raising revenue generally. The facts surrounding the offering confirm that Defendants commenced the offering as part and parcel of their fraudulent scheme and course of conduct and, while doing so, acted with scienter.

35. Pope and Slattery also profited directly as a result of the fraudulent scheme. Following the disclosure of the truth concerning the SurgiBot and Defendants' intentions with regard to its commercialization, Pope and Slattery executed beneficial trades involving TransEnterix stock just days later. On May 13, 2016, Slattery purchased 50,000 shares of TransEnterix stock—25,000 shares at an average price of $1.889 per share and 25,000 shares at an average price of $1.945. The total cost of Slattery's purchase was $95,850. By waiting until after TransEnterix's announcement on May 10, 2016, Slattery saved himself hundreds of thousands of dollars on the acquisition. For example, had Slattery purchased these shares at any point between April 4, 2016 and April 20, 2016, he would have spent at or around $5.00 per share of TransEnterix stock, resulting in a purchase price of approximately $500,000. Slattery owned zero shares of TransEnterix stock prior to his purchase on May 13, 2016. Slattery's purchase of stock on May 13, 2016 was suspicious in both timing and amount and, therefore, further supports a strong inference of scienter.

36. Pope, similar to Slattery, also purchased shares of TransEnterix stock within days of the May 10, 2016 revelation. On May 16, 2016, Pope exercised stock options covering 150,000 shares of TransEnterix stock. The exercise price of the options was below the then-market price of TransEnterix shares. By exercising these options when he did, the newly acquired shares were

worth only $288,000, compared to $750,000 had the shares been acquired earlier in the year (*e.g.*, between April 4, 2016 and April 20, 2016). By exercising these options when he did, Pope successfully lowered the bargain element associated with his incentive stock options for the purposes of reporting his alternative minimum tax, *i.e.*, secured favorable tax consequences. Pope owned only 21,010 shares of common stock before this transaction. Pope's exercise of options on May 16, 2016 was suspicious in both timing and amount and, therefore, also further supports a strong inference of scienter.

37. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding TransEnterix, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning TransEnterix, participated in the fraudulent scheme alleged herein.

**B. CLASS ACTION ALLEGATIONS**

38. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired TransEnterix stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

39. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. TransEnterix trades on the NYSEMKT and has more than 114 million shares outstanding, owned by hundreds, if not thousands, of persons.

40. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions that may affect individual Class members include:

(a) whether Defendants violated the 1934 Act;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the price of TransEnterix stock was artificially inflated; and

(f) the extent of damages sustained by Class members and the appropriate measure of damages.

41. Plaintiff's claims are typical of those of the Class because Plaintiff and the other Class members sustained damages from Defendants' wrongful conduct.

42. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

43. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## C. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

**February 10, 2016**

44. On February 10, 2016, the Company issued a press release stating that it had finalized its FDA 510(k) submission for the SurgiBot and "[c]ontinue[d] to anticipate SurgiBot FDA clearance by the end of the first quarter of 2016." The press release also added, in pertinent part, that:

> TransEnterix, Inc. (NYSE MKT: TRXC), a medical device company that is pioneering the use of robotics and flexible instruments to improve minimally invasive surgery, today announced the following:
>
> - Completes FDA Response. TransEnterix has successfully completed its response to the U.S. Food and Drug Administration (FDA) related to the pending 510(k) application submitted for clearance of the company's SurgiBot™ System.

- Strengthens Balance Sheet. Since September 30, 2015, the Company has raised $18 million in net proceeds at an average price of $3.23 per share under its $25 million "at-the-market" (ATM) equity sales facility that was established in February 2015. There is no further availability under this facility. ***The proceeds from these sales will be utilized to continue to support investments for the commercialization of*** the ALF-X® system in Europe, as well as ***the SurgiBot in the United States, following FDA clearance.***

- Files New ATM Facility. Following the successful completion of the prior ATM facility, the Company has entered into a new ATM facility that allows it the option to raise up to $43.6 million in equity from time to time through January 2017. The Company has no obligation to sell any shares under this facility

> "We are pleased to have completed our response to the FDA and strengthened our balance sheet," said TransEnterix President and CEO, Todd M. Pope. ***"We continue to expect FDA clearance for the SurgiBot System in the first quarter of this year, and our cash position allows us to accelerate our transition to commercializing*** both the ALF-X and ***the SurgiBot."***

45. The above statements in Paragraph 44 (identified in emphasis) were materially misleading. The statements were materially misleading because they omitted material information existing at the time of the statement and within Pope's possession. The material information that Pope omitted from the above statement included information that contradicted the factual basis for his statements. This information included the fact that: a) the FDA had, prior to the Class Period, publicly communicated a desire for increased information and regulation over robotically-assisted devices; b) Defendants had been in regular communication with the FDA during the 510(k) application process and received information concerning the need for increased information and regulation over robotically-assisted devices that coincided with the FDA's public communications; c) Defendants knew that the contents of the 510(k) application was insufficient in terms of achieving "substantial equivalence"; d) Defendants had already altered the internal strategy of the Company to focus on the ALF-X over the SurgiBot; and e) Defendants' statements concerning the SurgiBot were made primarily, if not exclusively, for the purpose of inflating the price of

TransEnterix's stock so as to be able to secure as much financing as possible through its "at-the-market" offerings.

46. Defendants' omissions were material. Evidence of the materiality of these omissions is apparent from the manner in which Defendants' misleading statements impacted the trading and price of TransEnterix's stock. In the days that followed Defendants' misleading statement, the volume of trading in TransEnterix's stock was elevated. Analyst sentiment comported with the general market's perception of Defendants' statements. Lake Street Capital Markets affirmed its "Buy" rating on TransEnterix stock, noting that the SurgiBot was "On Track" and reiterating management's claim that TransEnterix anticipated "Q2 2016 launch of the SurgiBot system in the United States." Further, had Defendants stated the truth about the SurgiBot and their intentions with respect to its commercialization, the truth would have altered the total mix of information available to investors at the time. The SurgiBot was one of the Company's two main product offerings. The future of TransEnterix depended upon, in large part, the viability of the SurgiBot. The truth about whether the SurgiBot could or would obtain "substantial equivalence" in connection with the 510(k) application was critical to the Company and investors.

**March 3, 2016**

47. On March 3, 2016, the Company reported its operating results for the fourth quarter and full year 2015. In a press release that day, the Company reiterated that it had "Submitted [its] 510(k) Application to the FDA for the SurgiBot™ System" and stated, in relevant part:

> "2015 was a transformative year for TransEnterix, as we are now positioned as a global surgical robotics company. ***In 2016, our focus will shift from product development to commercial execution***," said Todd M. Pope, President and Chief Executive Officer of TransEnterix. "We will continue building the infrastructure to support the commercialization of the ALF-X in multiple countries that accept CE Mark, ***and we remain focused on achieving FDA clearance for the SurgiBot by the end of March, 2016, and preparing for a U.S. commercial launch***."

48. Under the heading "2016 Priorities and Expectations," the press release added:

> During 2016, the Company will continue to expand its sales and service infrastructure for the ALF-X System in Europe and the Middle East. ***Following SurgiBot FDA***

> ***clearance, the Company intends to expand its U.S. sales and service infrastructure, develop training sites and work with key opinion leaders to gain clinical experience on SurgiBot.*** The Company plans to submit a 510(K) application to the FDA for the ALF-X system in the fourth quarter of 2016 and capitalize on the U.S. market opportunity in 2017 with a dual-platform portfolio.

49. The March 3, 2016 release also added:

> The Company had cash and cash equivalents of approximately $38.4 million as of December 31, 2015, and approximately $47.1 million as of February 29, 2016. The Company expects its existing cash and cash equivalents to fund operations through the end of 2016. Pursuant to the disclosure requirements of the NYSE MKT Company Guide Section 610(b), the Company is reporting that its audited consolidated financial statements for the fiscal year ended December 31, 2015, included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission expected to be filed on or about March 3, 2016, contains an audit opinion from its independent registered public accounting firm that includes an explanatory paragraph related to the Company's ability to continue as a going concern.

50. On March 3, 2016, the Company hosted a conference call to discuss its fourth quarter and full year 2015 financial results, with Pope and Slattery participating. During the call, Defendants made numerous statements regarding the status of the SurgiBot. For example, Pope stated, in relevant part:

> In the second quarter of 2015, we filed our 510(k) which was a big undertaking. It was a very extensive and comprehensive filing. We felt very good about it. As planned, we knew we'd hear back from the FDA with some of their feedback and questions, which we did in the Q3. ***And we've been taking the last quarter or two to really build up our answers to their questions. We've had a very proactive relationship with the FDA, very good. It continues to this day. And in the first quarter of 2016, we finalized our response and sent it back to the FDA***.
>
> We built eight complete systems of the SurgiBot and over 1,200 instruments in support of this machine. ***So we really felt like we got good experience with our manufacturing. We continue to expect about Q1 FDA clearance, which would be later this month***. I just have to say, as I step back and look at 2015; it was a tremendous year for the company. We really hit all of our targets that we set out to and then we took on a new one with the acquisition of ALF-X and that's turned out to be tremendous. So we're really proud of 2015 and super excited as we turn the page to look toward 2016.

* * *

> ***With the SurgiBot, following clearance, which we expect later this month, we want to expand our U.S. sales and service infrastructure.*** We want to early on develop trainee sites and work with those sites to develop key opinion leaders and gain valuable clinical experience as you do any time you launch a new platform.

*            *            *

> ***[W]ith SurgiBot following our FDA clearance***, our plans are as follows. We want to hire three area sales managers shortly after clearance. As we've been talking to you, we've been interviewing for a while. We've got a tremendous pipeline of candidates and we've got them lined up to be able to make those hires. And we want to go out and establish our commercial foundation. It always involves developing early clinical experience, making sure that the sites you sell into are willing to host other accounts and be a training site, you want to get a KOL or key opinion leader network, so they can go out and not only have a podium presence but a publication presence. And then we want to build a customer support infrastructure with service and the other things that go around early commercialization.

51. During the question and answer portion of the March 3, 2016 earnings call, Defendants were asked about the approval process for the Company's other key device, the ALF-X, and whether the Company had "some early discussions with the FDA on ALF-X and that's what's giving you the confidence to file it the end of this year?" In response, Pope created the false impression to investors that the Company was focused on the SurgiBot above all else at that present point in time:

> Yes. We have not gone and had an official meeting with the FDA on the ALF-X. ***We want to finalize our work with SurgiBot with them and then turn our attention to that***. I think from what I'm speaking of is, being in the business 25 years, having a lot of products go through the 510(k) process and certainly coming on the back of the SurgiBot experience, we feel like we were going to have a good solid submission where a good ways there and we're just going to finalize some things throughout this year to be able to file.

52. When asked for some "color about your last interaction with the FDA," Pope stated in relevant part:

> As we've characterized in the past, we filed, [the FDA] gave us their questions in a timely manner as we expected, we responded to their questions in a timely manner as they expected. And they confirmed that they received our questions and they're working through them. ***We have a good interaction with them. Any***

> ***interaction over the prior month or a couple of weeks have just been clarifying questions. So everything continues to be on the path that we set out last year***.

53. Also on March 3, 2016, the Company filed with the SEC its 2015 annual report on Form 10-K (the "2015 10-K"), which was signed by Pope and Slattery and contained required Sarbanes-Oxley certifications signed by each of them stating, among other things, that the annual report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Among other things, the 2015 10-K stated, in relevant part:

> The SurgiBot System is currently in development and is designed as a single-incision, patient-side robotic-assisted surgery system. The system is intended to bring many of the advantages of robotic assistance to single incision laparoscopic surgery while mitigating many of the drawbacks of existing robotic-assisted surgery systems. On June 1, 2015, the Company submitted its 510(k) application to the FDA for clearance of the SurgiBot System which was accepted for review.
>
> In August 2015, the FDA requested additional information related to the SurgiBot System 501(k) submission. The Company responded to the additional information request in February 2016. ***The Company anticipates that it will receive FDA clearance for the SurgiBot System by the end of the first quarter of 2016, and thereafter intends to launch sales of the SurgiBot System during the second quarter of 2016***.

54. Approval and commercialization of the SurgiBot was critical to the Company's success, as the 2015 10-K noted that "[i]n the year ended December 31, 2015, the Company had no revenue and no U.S. customers, as we focused our efforts on the SurgiBot System development." As of December 31, 2015, the Company had accumulated a deficit of $182.9 million and a net loss of approximately $46.9 million. Indeed, the 2015 10-K included a statement by the Company's independent registered public accounting firm, BDO USA, LLP, that the Company's "recurring losses from operations" and failure to "generate[] significant revenue or positive cash flows from operations . . . raise substantial doubt about the Company's ability to continue as a going concern."

55. The above statements in Paragraphs 47-48 and 50-53 (identified in emphasis) were materially misleading. The statements were materially misleading because they omitted material information existing at the time of the statement and within Pope's possession. The material information that Pope omitted from the above statement included information that contradicted the factual basis for his statements. This information included the fact that: a) the FDA had, prior to and during the Class Period, publicly communicated a desire for increased information and regulation over robotically-assisted devices; b) Defendants had been in regular communication with the FDA during the 510(k) application process and received information concerning the need for increased information and regulation over robotically-assisted devices that coincided with the FDA's public communications; c) Defendants knew that the contents of the 510(k) application was insufficient in terms of achieving "substantial equivalence"; d) Defendants had already altered the internal strategy of the Company to focus on the ALF-X over the SurgiBot; and e) Defendants' statements concerning the SurgiBot were made primarily, if not exclusively, for the purpose of inflating the price of TransEnterix's stock so as to be able to secure as much financing as possible through its "at-the-market" offerings.

56. Defendants' omissions were material. Evidence of the materiality of these omissions is apparent from the manner in which Defendants' misleading statements impacted the trading and price of TransEnterix's stock. In the days that followed Defendants' misleading statement, the volume of trading in TransEnterix's stock was elevated. Additionally, TransEnterix's stock price also increased in response to Defendants' March 3, 2016 statements, climbing from $3.20 per share on March 3, 2016 to $4.36 per share on March 9, 2016. Analyst sentiment comported with the general market's perception of Defendants' statements. RBC Capital Markets, for one, emphasized the fact that TransEnterix had "two compelling robotically assisted surgical platforms" and was "an exciting, up-and-coming small-cap growth story." RBC Capital Markets also reiterated Defendants' statements concerning the FDA's approval of the SurgiBot as well as TransEnterix's stated intentions for the SurgiBot's commercial launch. Further, had Defendants stated the truth about the SurgiBot and their intentions with respect to its

commercialization, the truth would have altered the total mix of information available to investors at the time. The SurgiBot was one of the Company's two main product offerings. The future of TransEnterix depended upon, in large part, the viability of the SurgiBot. The truth about whether the SurgiBot could or would obtain "substantial equivalence" in connection with the 510(k) application was critical to the Company and investors.

**March 11, 2016**

57. On March 11, 2016, the Company filed a prospectus relating to the sale of 15,543,413 shares of TransEnterix common stock by SOFAR S.p.A., which received those shares as part of the consideration paid by the Company for the acquisition of the ALF-X surgical robotic system. On March 11, 2016, the Company also filed a prospectus relating to the sale of 42,759,127 shares of TransEnterix common stock, "registered for the account of the investors" who acquired shares of TransEnterix common stock in the Company's 2013 private financing, which included Slattery.

58. Discussing the SurgiBot, both prospectuses stated, in relevant part:

> On June 1, 2015, we submitted our 510(k) application to the FDA for clearance of the SurgiBot System which was accepted for review. In August 2015, the FDA requested additional information related to the SurgiBot System 510(k) submission. We responded to that additional information request in February 2016. ***We anticipate that we will receive FDA clearance for the SurgiBot System by the end of the first quarter of 2016 and thereafter intend to launch sales of the SurgiBot System during the second quarter of 2016***.

59. The above statements in Paragraph 58 (identified in emphasis) were materially misleading. The statements were materially misleading because they omitted material information existing at the time of the statement and within Pope's possession. The material information that Pope omitted from the above statement included information that contradicted the factual basis for his statements. This information included the fact that: a) the FDA had, prior to and during the Class Period, publicly communicated a desire for increased information and regulation over robotically-assisted devices; b) Defendants had been in regular communication with the FDA

during the 510(k) application process and received information concerning the need for increased information and regulation over robotically-assisted devices that coincided with the FDA's public communications; c) Defendants knew that the contents of the 510(k) application was insufficient in terms of achieving "substantial equivalence"; d) Defendants had already altered the internal strategy of the Company to focus on the ALF-X over the SurgiBot; and e) Defendants' statements concerning the SurgiBot were made primarily, if not exclusively, for the purpose of inflating the price of TransEnterix's stock so as to be able to secure as much financing as possible through its "at-the-market" offerings.

60. Defendants' omissions were material. Evidence of the materiality of these omissions is apparent from the manner in which Defendants' misleading statements impacted the trading and price of TransEnterix's stock. In the days that followed Defendants' misleading statement, the volume of trading in TransEnterix's stock was elevated. Further, had the prospectus stated the truth about the SurgiBot and Defendants' intentions with respect to its commercialization, the truth would have altered the total mix of information available to investors at the time. The SurgiBot was one of the Company's two main product offerings. The future of TransEnterix depended upon, in large part, the viability of the SurgiBot. The truth about whether the SurgiBot could or would obtain "substantial equivalence" in connection with the 510(k) application was critical to the Company and investors.

**March 24, 2016**

61. On March 24, 2016, the Company issued a press release to provide an "Update on [its] SurgiBot FDA 510(k) Submission Process." The press release stated that the Company had received an update from the FDA on the status of the 510(k) submission for the SurgiBot, and also stated, in relevant part:

> The FDA advised the Company that it has not yet concluded the review of the Company's 510(k) submission and provided an update on the status of the filing. The Company has updated its timing expectations and now expects to receive a decision from the FDA by mid-April, 2016. The Company previously expected a decision from the FDA in the first quarter of 2016.

> ***"We have been engaged in constructive dialogue with the FDA throughout the entire submission process," said Todd M. Pope, President and Chief Executive Officer of TransEnterix. "We appreciate the proactive exchange with the FDA and look forward to their decision, and continue to expect clearance for the SurgiBot.***"

62. The above statements in Paragraph 61 (identified in emphasis) were materially misleading. The statements were materially misleading because they omitted material information existing at the time of the statement and within Pope's possession. The material information that Pope omitted from the above statement included information that contradicted the factual basis for his statements. This information included the fact that: a) the FDA had, prior to and during the Class Period, publicly communicated a desire for increased information and regulation over robotically-assisted devices; b) Defendants had been in regular communication with the FDA during the 510(k) application process and received information concerning the need for increased information and regulation over robotically-assisted devices that coincided with the FDA's public communications; c) Defendants knew that the contents of the 510(k) application was insufficient in terms of achieving "substantial equivalence"; d) Defendants had already altered the internal strategy of the Company to focus on the ALF-X over the SurgiBot; and e) Defendants' statements concerning the SurgiBot were made primarily, if not exclusively, for the purpose of inflating the price of TransEnterix's stock so as to be able to secure as much financing as possible through its "at-the-market" offerings.

63. Defendants' omissions were material. Evidence of the materiality of these omissions is apparent from the manner in which Defendants' misleading statements impacted the trading and price of TransEnterix's stock. In the days that followed Defendants' misleading statement, the volume of trading in TransEnterix's stock was elevated. Analysts also found Defendants' misleading statements to be materials. For example, RBC Capital Markets echoed Defendants' statements, noting that the delay in FDA approval did not impact its view on the stock. RBC Capital Markets also noted that it had spoken to TransEnterix on March 24, 2016 and that "management [was] confident in final FDA approval in mid-April."

64. Had the press release stated the truth about the SurgiBot and Defendants' intentions with respect to its commercialization, the truth would have altered the total mix of information available to investors at the time. The SurgiBot was one of the Company's two main product offerings. The future of TransEnterix depended upon, in large part, the viability of the SurgiBot. The truth about whether the SurgiBot could or would obtain "substantial equivalence" in connection with the 510(k) application was critical to the Company and investors.

## D. THE TRUTH BEGINS TO EMERGE

### April 20, 2016

65. After the market closed on April 20, 2016, Defendants shocked investors when the Company issued a press release stating that it received a response from the FDA on the SurgiBot 510(k) submission. The press release stated, in relevant part:

> TransEnterix, Inc. (NYSE MKT:TRXC) today announced that the United States Food and Drug Administration ("FDA") notified the Company on April 19, 2016 that the FDA has determined that the SurgiBot™ System does not meet the criteria for substantial equivalence based upon the data and information submitted by TransEnterix in its 510(k) submission.
>
> "The FDA's decision is extremely disappointing. We are in the process of reviewing all aspects of the FDA's communication," said Todd M. Pope, President and CEO of TransEnterix. "We will work to complete this review, and will provide an update on the regulatory strategy for the SurgiBot System together with our first quarter 2016 financial and operating results during our quarterly conference call on May 10, 2016."

66. The disclosure on April 20, 2016, signaled to investors that Defendants' previous statements concerning the FDA's review of the SurgiBot 510(k) application were materially misleading. Investors perceived TransEnterix's April 20, 2016 disclosure to be a revelation that Defendants' prior statements were materially inaccurate in that the prior statements failed to disclose the true facts relating to the SurgiBot product and the Company's plans for commercializing it.

67. Analysts similarly understood the April 20, 2016 disclosure as revealing partial truths about Defendants' prior misrepresentations. For example, analysts from BTIG questioned

TransEnterix's previous statements, commenting that "[management] had previously discussed their submission and felt they had crossed all Ts and dotted all Is in terms of making sure the agency was comfortable with the predicate and the data they planned to submit. We always wondered about the need for human data but per [management] the FDA did not seem to require it." Presciently, the analysts from BTIG also speculated that TransEnterix would be better off "focus[ing] exclusively on ALF-X" in light of the fact that ALF-X was already "CE marked" and that TransEnterix had "limited cash."

68. TransEnterix's stock price suffered a precipitous decline on heavy trading in response to the April 20, 2016 disclosure. This decline is further evidence that the April 20, 2016 disclosure revealed, at least in part, Defendants' fraudulent scheme and course of conduct. In response to the April 20, 2016 revelation, the price of TransEnterix stock dropped suddenly. After closing at $4.74 on April 20, 2016, the stock opened at $1.57 per share on April 21, 2016, fell to a low of $1.28 and ultimately closed at $2.27, a decline of more than 50%, on abnormally high trading volume of more than 21.5 million shares. Had the April 20, 2016 revelation failed to disclose anything of materiality or corrective in nature, the decline in TransEnterix's stock price would not have been so severe or even occurred at all. The reaction of the market to the Company's April 20, 2016 disclosure is evidence that the disclosure revealed material information previously withheld and/or omitted by Defendants.

**May 10, 2016**

69. After the market closed on May 10, 2016, the Company issued a press release, filed its quarterly report on Form 10-Q (the "1Q2016 10-Q"), and hosted a conference call. In the press release, the Company stated, in relevant part:

> As previously announced, the Company received a Not Substantially Equivalent ("NSE") letter from the U.S. Food and Drug Administration ("FDA"). The Company expects to have further discussions with the FDA, but currently believes that a new 510(k) submission would be required to obtain clearance. The Company has evaluated the operational and financial feasibility of pursuing 510(k)s for SurgiBot and ALF-X concurrently, and has decided to reprioritize its near-term regulatory efforts and focus on the ALF-X 510(k) submission. As a

> result, in the 2016 second quarter, the Company has taken actions to reduce headcount and investment related to the SurgiBot.

70. In the 1Q2016 10-Q, the Company stated, in relevant part:

> Our current strategy is to focus our resources on the commercialization of and regulatory clearance for the ALF-X System. In order to obtain a clearance for the SurgiBot System, we believe that a new 510(k) application would need to be submitted after further interactions with the FDA. Based on this belief, we have evaluated the operational and financial feasibility of pursuing two 510(k) applications in parallel and have elected to focus our near term efforts on the 510(k) submission for the ALF-X System and to delay any potential re-filing for the SurgiBot System until after we achieve ALF-X System clearance in the U.S.

71. The 1Q2016 10-Q also stated that during the first quarter 2016 ended March 31, 2016, but prior to the negative news regarding the SurgiBot reaching the market, the Company sold more than 9 million shares of stock for total gross proceeds of more than $32 million through "at the-market" offerings covered by a 2015 sales agreement and a 2016 sales agreement with Cantor Fitzgerald & Co., as well as the Company's shelf registration statement. Specifically, under the terms of the 2015 sales agreement, TransEnterix sold 5,710,200 shares at an average price per share of $3.23 for gross proceeds of $18,454,000. Pursuant to the 2016 sales agreement, TransEnterix sold 3,427,500 shares at an average price of $4.11 for gross proceeds of $14,084,000 followed by an additional 5,335,957 shares of common stock through April 18, 2016 under the 2016 sales agreement at an average price per share of $5.07 for gross proceeds of $27.1 million.

72. During the May 10, 2016 conference call, Pope stated, in relevant part:

> In June of 2015, we've submitted our 510(k) application, which was an extensive compilation of documentation and testing results. As is typical in the 510(k) process, within 60 days, we received the request for additional information from the FDA, called an AI, and immediately undertook the actions necessary to respond to their request. The 510(k) process gives the company up to six months to respond to an AI. And we submitted our response in February 2016.
>
> In total, over the course of the submission we provided over 11,000 pages of requested material to the FDA. After a total of 138 days of FDA review, we received the NSE for the SurgiBot. The reason stated by the FDA for this decision included items that we believe we had adequately addressed through the interactive period.

> Since receiving the NSE, we've been analyzing the FDA's response together with regulatory counsel. I have personally interacted with the Director of the Division of Surgical Devices of the FDA, along with the Director of the CDRH for the FDA, to request an in-person meeting to review the topics raised in the NSE, which they have agreed to, but has not yet been scheduled.
>
> The current situation is as follows. This 510(k) file is now considered closed by the agency. We do expect further discussions with the FDA to help inform our future regulatory strategy for both SurgiBot and ALF-X. As it stands today, we believe that a new 510(k) would need to be submitted for SurgiBot.
>
> Based on this belief, we've evaluated the operational and financial feasibility of pursuing two 510(k)s concurrently and have elected to focus our efforts on the 510(k) submission for the ALF-X. In anticipation of clearance, we have been investing substantially in continuing development and production efforts for SurgiBot. This week we have taken significant actions to reduce infrastructure in these areas of the business.
>
> These actions put us in a stronger financial position to allow us to fully focus on ALF-X commercialization and prepare the FDA 510(k) submission for ALF-X, while also investing in expanding the capabilities of the ALF-X platform.

73. During the question and answer portion of the call, Pope stated that "over the last three years," the landscape for FDA approval of the SurgiBot had "changed," which implied that the Company's 510(k) submission for the SurgiBot failed to account for such changes. Specifically, Pope stated, in relevant part:

> Two parts, I'll kind of start a little bit with kind of our takeaways from our recent NSE. I do think as we think about robotically-assisted surgical device, the way the FDA is classifying these, RASD, they're more complex and comprehensive than some 510(k). So I think in some regard, focus on the 90-day clock in the 510(k), some point can work against you in a large complicated submission.
>
> I certainly think as we think back on our interaction over the last three years, certain things have changed with the landscape. I think there's more scrutiny on robotics. Certainly, there was a public forum last summer for two days. And there's been three or four guidance documents released during that time that affects robotics products.
>
> So I think we're a little smarter now. We certainly have those takeaways. But as we focus on your question on ALF-X, as we think about U.S. 510(k) submission, we certainly think we're better positioned. First of all, the ALF-X has a CE Mark, had that for several years. We've got clinical data. We've got several systems out in clinical use. We have multiple publications from multiple specialties. So, we just

> think we're going in to the ALF-X filing in a different and stronger position than we were with SurgiBot.

74. The disclosure on May 10, 2016, signaled to investors that Defendants' previous statements concerning the FDA's review of the SurgiBot 510(k) application were materially misleading. Investors perceived TransEnterix's May 10, 2016 disclosure to be a revelation that Defendants' prior statements were materially inaccurate in that the prior statements failed to disclose the true facts relating to the SurgiBot product and the Company's plans for commercializing it.

75. Analysts similarly understood the May 10, 2016 disclosure as revealing partial truths about Defendants' prior misrepresentations. Analysts from BTIG once again met Defendants' statements with skepticism, stating that Defendants' May 10, 2016 statements led them to have "more questions than answers." Similar to investors, BTIG was "looking for clarity regarding the denial of the Surgi[B]ot 510(k) app[lication]." BTIG noted that "[management] did not give any reasons," even after management had spent nearly three weeks digesting the SurgiBot's recent rejection. BTIG stated further that "[i]investors rarely take kindly to not being given information."

76. TransEnterix's stock price suffered a further precipitous decline on heavy trading in response to the May 10, 2016 disclosure. This decline is further evidence that the May 10, 2016 disclosure revealed Defendants' fraudulent scheme and course of conduct. In response to the May 10, 2016 revelation, the price of TransEnterix stock dropped from $2.06 per share on May 10, 2016, to $1.84 on May 11, 2016, on elevated trading volume of more than 5.5 million shares. Had the May 10, 2016 revelation failed to disclose anything of materiality or corrective in nature, the decline in TransEnterix's stock price would not have been so severe or even occurred at all. The reaction of the market to the Company's May 10, 2016 disclosure is evidence that the disclosure revealed material information previously withheld and/or omitted by Defendants.

77. Between the April 20 and May 10, 2016 disclosures, investors discovered the truth about the SurgiBot and Defendants' plans for its commercialization. The true facts, which were

known by Defendants but concealed from the investing public during the Class Period, were as follows:

(a) Defendants' Class Period statements omitted disclosure of key aspects of the Company's business, specifically deficiencies within the Company's 510(k) submission regarding the SurgiBot, including communications with the FDA that undermined the likelihood that the SurgiBot 510(k) would receive FDA clearance;

(b) Defendants' Class Period statements omitted information regarding whether the SurgiBot possessed substantial equivalence to existing robotic surgical devices, leaving investors unable to accurately assess the validity of Defendants' repeated Class Period statements that the Company's SurgiBot 510(k) was likely to achieve FDA clearance;

(c) Defendants intended to focus primarily, if not exclusively, on commercializing the ALF-X while minimizing further investment in the SurgiBot;

(d) Defendants' statements concerning the SurgiBot during the Class Period were made for the purpose of inflating TransEnterix's stock price and maximizing the profits obtained by the Company during its "at-the-market" offerings during the Class Period; and

(e) as a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading and lacked a reasonable basis when made.

**E. LOSS CAUSATION AND ECONOMIC LOSS**

78. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of TransEnterix stock and operated as a fraud or deceit on Class Period purchasers of TransEnterix stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market on April 20 and May 10, 2016, the price of TransEnterix stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of TransEnterix stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal

securities laws when the truth about TransEnterix was revealed through the disclosures specified herein, which removed the artificial inflation from the price of TransEnterix common stock.

79. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of TransEnterix's business and prospects. Defendants' false and misleading statements had the intended effect and caused TransEnterix stock to trade at artificially inflated levels throughout the Class Period.

80. As a direct result of the disclosure identified herein, the price of TransEnterix stock fell precipitously. This removed the artificial inflation from the price of TransEnterix stock, causing real economic loss to investors who had purchased TransEnterix stock at artificially inflated prices during the Class Period.

81. The price declines on April 21 and May 11, 2016 were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market through the after-hours disclosures on April 20 and May 10, 2016. The timing and magnitude of the price declines in TransEnterix stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of TransEnterix stock and the subsequent significant decline in the value of TransEnterix stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**F. PRESUMPTION OF RELIANCE**

82. At all relevant times, the market for TransEnterix stock was an efficient market for the following reasons, among others:

(a) TransEnterix stock met the requirements for listing and was listed and actively traded on the NYSEMKT, a highly efficient and automated market;

(b) as a regulated issuer, TransEnterix filed periodic public reports with the SEC;

(c) TransEnterix regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) TransEnterix was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

83. As a result of the foregoing, the market for TransEnterix stock promptly digested current information regarding TransEnterix from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of TransEnterix stock during the Class Period suffered similar injury through their purchase of TransEnterix stock at artificially inflated prices and a presumption of reliance applies under the fraud-on-the-market doctrine.

84. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions regarding, among other things, the SurgiBot, that requirement is satisfied here.

**G. NO SAFE HARBOR**

85. The "Safe Harbor" warnings accompanying TransEnterix's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those

statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.

86. Defendants are also liable for any false and misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of TransEnterix who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported Safe Harbor warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**COUNT I**

**Defendants Violated Section 10(b) and SEC Rule 10b-5(a)**

87. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

88. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89. Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and other Class members in connection with their purchases of TransEnterix stock during the Class Period.

90. In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to TransEnterix's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

91. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members have suffered damages in connection with their respective purchases and sales of TransEnterix stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for TransEnterix stock and experienced loses when the artificial inflation was released from TransEnterix stock as a result of the revelations and stock price decline detailed herein. Plaintiff and the other Class members would not have purchased TransEnterix stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

92. By virtue of the foregoing, TransEnterix and the Individual Defendants have each violated Section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

**COUNT II**

**Pope and Slattery Violated Section 20(a) of the 1934 Act**

93. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

94. The Individual Defendants acted as controlling persons of TransEnterix within the meaning of Section 20(a) of the 1934 Act. By reason of their controlling positions with the Company, and their ownership of TransEnterix common stock, the Individual Defendants had the power and authority to cause TransEnterix to engage in the wrongful conduct complained of herein. TransEnterix controlled the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## COUNT III

### TransEnterix Violated Section 20A of the 1934 Act

95. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

96. As detailed herein, TransEnterix was in possession of material, non-public information concerning the Company's communications with the FDA and Defendants' intentions with regard to the SurgiBot. TransEnterix took advantage of its possession of material, non-public information regarding the SurgiBot to obtain millions of dollars in insider trading profits during the Class Period.

97. Between March 1, 2016 and April 19, 2016, TransEnterix sold approximately 8.7 million shares of TransEnterix common stock through an "at-the-market" offering. TransEnterix received gross proceeds of over $14 million from the sale of approximately 3.4 million shares of TransEnterix stock at an average market price of $4.11 per share. TransEnterix also received additional gross proceeds of $27.1 million from the sale of approximately 5.3 million shares at an average market price of $5.07 per share.

98. During this same time period, Plaintiffs and other members of the Class purchased significant amounts of stock. Plaintiffs' purchases are indicated in their Certifications which, as indicated previously, are incorporated herein by reference.

99. Plaintiffs who purchased shares of TransEntereix common stock contemporaneously with sales by TransEnterix suffered damages because: a) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and b) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## II. SECURITIES ACT ALLEGATIONS

### A. SUBSTANTIVE ALLEGATIONS

100. Plaintiffs' claims under the Securities Act sound in negligence and/or strict liability. Plaintiffs expressly disclaim that the Securities Act Defendants acted with fraudulent intent or scienter in connection with Plaintiffs' claims under the Securities Act, as set forth below.

101. TransEnterix filed a Form S-3 Registration Statement with the SEC on January 8, 2014. TransEnterix amended the Form S-3 Registration Statement on March 7, 2014, March 31, 2014, and April 2, 2014. TransEnterix filed a Preliminary Prospectus on April 2, 2014, followed by a Prospectus Supplement on February 9, 2016. TransEnterix's Registration Statement, Amended Registration Statements, Preliminary Prospectus, and Prospectus Supplement are referred to herein collectively as the "Registration Statement".

102. Pope and Slattery signed the Registration Statement.

103. The Director Defendants were directors of TransEnterix at the time the Registration Statement was filed and/or became effective for the "at-the-market" offerings between February and April 2016.

104. Discussing the SurgiBot, the Registration Statement stated, in relevant part:

> On June 1, 2015, we submitted our 510(k) application to the FDA for clearance of the SurgiBot System which was accepted for review. In August 2015, the FDA requested additional information related to the SurgiBot System 510(k) submission. We responded to that additional information request in February 2016. ***We anticipate that we will receive FDA clearance for the SurgiBot System by the end of the first quarter of 2016 and thereafter intend to launch sales of the SurgiBot System during the second quarter of 2016.***

105. The above statements in Paragraph 104 (identified in emphasis) were materially misleading. The statements were materially misleading because they omitted material information existing at the time of the statement. The material information omitted from the above statement included information that contradicted the factual basis for the above statements. This information included the fact that: a) the FDA had publicly communicated a desire for increased information

and regulation over robotically-assisted devices during a public forum in July 2015; b) the FDA reiterated its desire for increased information and regulation over robotically-assisted devices through regular, private communications between the FDA and TransEnterix; and c) the Securities Act Defendants should have known or failed to reasonably know that the contents of the 510(k) application was insufficient in terms of achieving "substantial equivalence". Had the Securities Act Defendants performed better due diligence or acted within a reasonable standard of care when making the statements that they did, they would have discovered that their statements were materially misleading given that it was known (or should have been known) that the FDA would reject the 510(k) application.

106. The Securities Act Defendants' omissions were material. Had the prospectus stated the truth about the SurgiBot and the Securities Act Defendants' intentions with respect to its commercialization, the truth would have altered the total mix of information available to investors at the time. The SurgiBot was one of the Company's two main product offerings. The future of TransEnterix depended upon, in large part, the viability of the SurgiBot. The truth about whether the SurgiBot could or would obtain "substantial equivalence" in connection with the 510(k) application was critical to the Company and investors.

107. The truth concerning the Securities Act Defendants' omissions came to light on April 20 and May 10, 2016. After the market closed on April 20, 2016, the Company issued a press release stating that it received a response from the FDA on the SurgiBot 510(k) submission. The press release stated, in relevant part:

> TransEnterix, Inc. (NYSE MKT:TRXC) today announced that the United States Food and Drug Administration ("FDA") notified the Company on April 19, 2016 that the FDA has determined that the SurgiBot™ System does not meet the criteria for substantial equivalence based upon the data and information submitted by TransEnterix in its 510(k) submission.
>
> "The FDA's decision is extremely disappointing. We are in the process of reviewing all aspects of the FDA's communication," said Todd M. Pope, President and CEO of TransEnterix. "We will work to complete this review, and will provide an update on the regulatory strategy for the SurgiBot System together

with our first quarter 2016 financial and operating results during our quarterly conference call on May 10, 2016."

108. The disclosure on April 20, 2016, signaled to investors that the Securities Act Defendants' previous statements concerning the FDA's review of the SurgiBot 510(k) application were materially misleading. Investors perceived TransEnterix's April 20, 2016 disclosure to be a revelation that the Securities Act Defendants' prior statements were materially inaccurate in that the prior statements failed to disclose the true facts relating to the SurgiBot product and the Company's plans for commercializing it.

109. Analysts similarly understood the April 20, 2016 disclosure as revealing partial truths about the Securities Act Defendants' prior misrepresentations. For example, analysts from BTIG questioned TransEnterix's previous statements, commenting that "[management] had previously discussed their submission and felt they had crossed all Ts and dotted all Is in terms of making sure the agency was comfortable with the predicate and the data they planned to submit. We always wondered about the need for human data but per [management] the FDA did not seem to require it." Presciently, the analysts from BTIG also speculated that TransEnterix would be better off "focus[ing] exclusively on ALF-X" in light of the fact that ALF-X was already "CE marked" and that TransEnterix had "limited cash."

110. TransEnterix's stock price suffered a precipitous decline on heavy trading in response to the April 20, 2016 disclosure. This decline is further evidence that the April 20, 2016 disclosure revealed, at least in part, the Securities Act Defendants' negligent course of conduct. In response to the April 20, 2016 revelation, the price of TransEnterix stock dropped suddenly. After closing at $4.74 on April 20, 2016, the stock opened at $1.57 per share on April 21, 2016, fell to a low of $1.28 and ultimately closed at $2.27, a decline of more than 50%, on abnormally high trading volume of more than 21.5 million shares. Had the April 20, 2016 revelation failed to disclose anything of materiality or corrective in nature, the decline in TransEnterix's stock price would not have been so severe or even occurred at all. The reaction of the market to the Company's

April 20, 2016 disclosure is evidence that the disclosure revealed material information previously omitted by the Securities Act Defendants.

111. After the market closed on May 10, 2016, the Company issued a press release, filed the 1Q2016 10-Q, and hosted a conference call. In the press release, the Company stated, in relevant part:

> As previously announced, the Company received a Not Substantially Equivalent ("NSE") letter from the U.S. Food and Drug Administration ("FDA"). The Company expects to have further discussions with the FDA, but currently believes that a new 510(k) submission would be required to obtain clearance. The Company has evaluated the operational and financial feasibility of pursuing 510(k)s for SurgiBot and ALF-X concurrently, and has decided to reprioritize its near-term regulatory efforts and focus on the ALF-X 510(k) submission. As a result, in the 2016 second quarter, the Company has taken actions to reduce headcount and investment related to the SurgiBot.

112. In the 1Q2016 10-Q, the Company stated, in relevant part:

> Our current strategy is to focus our resources on the commercialization of and regulatory clearance for the ALF-X System. In order to obtain a clearance for the SurgiBot System, we believe that a new 510(k) application would need to be submitted after further interactions with the FDA. Based on this belief, we have evaluated the operational and financial feasibility of pursuing two 510(k) applications in parallel and have elected to focus our near term efforts on the 510(k) submission for the ALF-X System and to delay any potential re-filing for the SurgiBot System until after we achieve ALF-X System clearance in the U.S.

113. During the May 10, 2016 conference call, Pope stated, in relevant part:

> In June of 2015, we've submitted our 510(k) application, which was an extensive compilation of documentation and testing results. As is typical in the 510(k) process, within 60 days, we received the request for additional information from the FDA, called an AI, and immediately undertook the actions necessary to respond to their request. The 510(k) process gives the company up to six months to respond to an AI. And we submitted our response in February 2016.
>
> In total, over the course of the submission we provided over 11,000 pages of requested material to the FDA. After a total of 138 days of FDA review, we received the NSE for the SurgiBot. The reason stated by the FDA for this decision included items that we believe we had adequately addressed through the interactive period.

> Since receiving the NSE, we've been analyzing the FDA's response together with regulatory counsel. I have personally interacted with the Director of the Division of Surgical Devices of the FDA, along with the Director of the CDRH for the FDA, to request an in-person meeting to review the topics raised in the NSE, which they have agreed to, but has not yet been scheduled.
>
> The current situation is as follows. This 510(k) file is now considered closed by the agency. We do expect further discussions with the FDA to help inform our future regulatory strategy for both SurgiBot and ALF-X. As it stands today, we believe that a new 510(k) would need to be submitted for SurgiBot.
>
> Based on this belief, we've evaluated the operational and financial feasibility of pursuing two 510(k)s concurrently and have elected to focus our efforts on the 510(k) submission for the ALF-X. In anticipation of clearance, we have been investing substantially in continuing development and production efforts for SurgiBot. This week we have taken significant actions to reduce infrastructure in these areas of the business.
>
> These actions put us in a stronger financial position to allow us to fully focus on ALF-X commercialization and prepare the FDA 510(k) submission for ALF-X, while also investing in expanding the capabilities of the ALF-X platform.

114. During the question and answer portion of the call, Pope stated that "over the last three years," the landscape for FDA approval of the SurgiBot had "changed," which implied that the Company's 510(k) submission for the SurgiBot failed to account for such changes. Specifically, Pope stated, in relevant part:

> Two parts, I'll kind of start a little bit with kind of our takeaways from our recent NSE. I do think as we think about robotically-assisted surgical device, the way the FDA is classifying these, RASD, they're more complex and comprehensive than some 510(k). So I think in some regard, focus on the 90-day clock in the 510(k), some point can work against you in a large complicated submission.
>
> I certainly think as we think back on our interaction over the last three years, certain things have changed with the landscape. I think there's more scrutiny on robotics. Certainly, there was a public forum last summer for two days. And there's been three or four guidance documents released during that time that affects robotics products.
>
> So I think we're a little smarter now. We certainly have those takeaways. But as we focus on your question on ALF-X, as we think about U.S. 510(k) submission, we certainly think we're better positioned. First of all, the ALF-X has a CE Mark, had that for several years. We've got clinical data. We've got several systems out in clinical use. We have multiple publications from multiple specialties. So, we just

think we're going in to the ALF-X filing in a different and stronger position than we were with SurgiBot.

115. The disclosure on May 10, 2016, signaled to investors that the Securities Act Defendants' previous statements concerning the FDA's review of the SurgiBot 510(k) application negligently omitted material information. Investors perceived TransEnterix's May 10, 2016 disclosure to be a revelation that the Securities Act Defendants' prior statements were materially inaccurate in that the prior statements failed to disclose the true facts relating to the SurgiBot product and the Company's plans for commercializing it.

116. Analysts similarly understood the May 10, 2016 disclosure as revealing partial truths about the Securities Act Defendants' prior misrepresentations. Analysts from BTIG once again met Defendants' statements with skepticism, stating that the Securities Act Defendants' May 10, 2016 statements led them to have "more questions than answers." Similar to investors, BTIG was "looking for clarity regarding the denial of the Surgi[B]ot 510(k) app[lication]." BTIG noted that "[management] did not give any reasons," even after management had spent nearly three weeks digesting the SurgiBot's recent rejection. BTIG stated further that "[i]nvestors rarely take kindly to not being given information."

117. TransEnterix's stock price suffered a further precipitous decline on heavy trading in response to the May 10, 2016 disclosure. This decline is further evidence that the May 10, 2016 disclosure revealed the Securities Act Defendants' negligent course of conduct. In response to the May 10, 2016 revelation, the price of TransEnterix stock dropped from $2.06 per share on May 10, 2016, to $1.84 on May 11, 2016, on elevated trading volume of more than 5.5 million shares. Had the May 10, 2016 revelation failed to disclose anything of materiality or corrective in nature, the decline in TransEnterix's stock price would not have been so severe or even occurred at all. The reaction of the market to the Company's May 10, 2016 disclosure is evidence that the disclosure revealed material information previously omitted by the Securities Act Defendants.

**B. CLASS ACTION ALLEGATIONS**

118. Plaintiffs bring these claims under the Securities Act on behalf of all individuals

and entities who purchased or otherwise acquired TransEnterix common stock in connection with the Company's "at-the-market" offering between February 9, 2016 and April 19, 2016 (inclusive) and were damaged, excluding the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Securities Act Class").

119. The members of the Securities Act Class are so numerous that joinder of all members is impracticable. Throughout the Securities Act Class Period, TransEnterix common stock was actively traded on the New York Stock Exchange. While the exact number of Securities Act Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Securities Act Class. Record owners and other members of the Securities Act Class may be identified from records maintained by TransEnterix, Cantor Fitzgerald, or TransEnterix's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. TransEnterix's "at-the-market" offering involved the sale of approximately 8.7 million shares of common stock. Upon information and belief, these shares are held by thousands of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

120. Plaintiffs' claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class are similarly affected by the Securities Act Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

121. Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Securities Act Class.

122. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

(a) whether the Securities Act was violated by the Securities Act Defendants' respective acts as alleged herein;

(b) whether the Securities Act Defendants acted negligently; and

(c) whether the members of the Securities Act Class have sustained damages and, if so, what is the proper measure of damages.

123. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT IV

### The Securities Act Defendants Violated Section 11 of the Securities Act

124. Plaintiffs repeat and reallege the allegations contained above in Paragraphs 100 to 123.

125. As set forth above, TransEnterix's Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading.

126. TransEntrix is the registrant for the "at-the-market" offering. As issuer of the shares, TransEnterix is strictly liable to Plaintiffs and to the members of the Class for the materially untrue statements and omissions alleged herein.

127. TransEnterix's Registration Statement was signed by Pope and Slattery on behalf of the Company.

128. The Director Defendants were directors at the time the Registration Statement became effective and/or during TransEnterix's "at-the-market" offering.

129. The Individual Securities Act Defendants were named in the Registration Statement as being or about to become a director of, or person performing similar functions in, TransEnterix.

130. Cantor Fitzgerald was the underwriter with respect to the TransEnterix securities

offered in the "at-the-market" offering.

131. Plaintiffs and the other members of the Securities Act Class purchased TransEnterix securities offered in the "at-the-market" offering.

132. Plaintiffs and the other members of the Class were damaged by the Securities Act Defendants as a direct and proximate result of the untrue statements and omissions in the Registration Statement.

133. This claim was brought within the applicable statute of limitations.

134. By reason of the foregoing, the Securities Act Defendants have violated Section 11 of the Securities Act and are liable to Plaintiffs and the other members of the Class.

**COUNT V**

**The Individual Securities Act Defendants Violated Section 15 of the Securities Act**

135. Plaintiffs repeat and reallege the allegations contained above in Paragraphs 100 to 134.

136. Each of the Individual Securities Act Defendants participated in the operation and management of TransEnterix at the time of the "at-the-market" offering and conducted and participated, directly and indirectly, in the conduct of TransEnterix's business affairs.

137. Each of the Individual Securities Act Defendants was involved in the day-to-day operations of the Company at the highest levels.

138. Each of the Individual Securities Act Defendants was privy to confidential proprietary information concerning the Company and its business and operations.

139. The Individual Securities Act Defendants were senior officers and directors of TransEnterix. Due to their positions of control and authority, the Individual Securities Act Defendants were able to, and did, control the contents of the Registration Statement that contained materially false and inaccurate information.

140. The Individual Securities Act Defendants each signed, or caused to be signed on their behalf, the Registration Statement.

141. The Individual Securities Act Defendants were controlling persons of TransEnterix under the Securities Act.

142. TransEnterix's conduct, as alleged herein, constitutes a violation of Section 11 the Securities Act. The Individual Securities Act Defendants are liable to Plaintiffs and the other members of the Securities Act Class, jointly and severally with and to the same extent as TransEnterix, for violations under Section 15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs, and certifying Plaintiffs as a Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: September 26, 2016

S. Ranchor Harris, III

/s/ S. Ranchor Harris, III

S. Ranchor Harris, III
8800 Cottingham Way
Raleigh, N.C. 27615
(336) 500-1835
Ranchorharris@gmail.com
State Bar No. N.C. 21022

Nicholas I. Porritt
Adam M. Apton
Levi & Korsinsky LLP

1101 30th Street, N.W.
Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
(*pro hac vice to be submitted*)

*Counsel for Lead Plaintiffs Randall Clark, Samir Patel, the Underhill Cemetery Association, and the North Underhill Cemetery Association and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all counsel of record registered via the CM/ECF system.

/s/ S. Ranchor Harris, III
S. Ranchor Harris, III